**SCHOCKETT et al. v. BROMLEY et al.**

No. 4429.

United States Court of Appeals
Tenth Circuit.

June 28, 1952.

Samuel S. Ginsberg, Denver, Colo. (Simon Quiat, Denver, Colo., on the brief), for appellants.

Robert D. Charlton, Denver, Colo. (Kenneth W. Robinson, Denver, Colo., on the brief), for appellee Charles D. Bromley.

Before PHILLIPS, Chief Judge, and BRATTON and MURRAH, Circuit Judges.

PHILLIPS, Chief Judge.

This is an appeal from an order denying a petition for leave to intervene.

On July 18, 1951, Harry Sobol, individually, Harry Sobol, doing business as Gross Finance Company,[1] and Harry Sobol, as the liquidating partner of Drive-In Finance Company, a dissolved partnership composed of Harry Sobol and Howard J. Sobol, filed a voluntary petition in bankruptcy and on that date was duly adjudged a bankrupt. Bromley is the duly appointed, qualified, and acting trustee of the bankrupt.

The trustee brought this action against Harry Sobol, Chester Sobol, M. B. Sobol, and the Broadway Industrial Bank.[2] In his complaint the trustee alleged the filing of the bankruptcy petition and the adjudication; and further alleged that he is the duly appointed and qualified trustee of the bankrupt; that on December 12, 1950, the bankrupt, Harry Sobol, his brother, Chester

---

1. Hereinafter called the Finance Company.

2. Hereinafter called the Bank.

Sobol, and his son, M. B. Sobol, were engaged in business as the Finance Company, at Denver, Colorado; that the Finance Company became insolvent and was unable to pay its creditors; that at such time, among the assets of the Finance Company were promissory notes of the approximate face value of $270,377.12, and that such notes were secured by chattel mortgages on automobiles or automobile installment contracts; that such notes, so secured, comprised substantially all the assets of the Finance Company; that the three Sobols, for the purpose of hindering, defrauding, and delaying the creditors of the Finance Company, and for the purpose of appropriating its assets to their own use, determined to place such assets beyond the reach of the creditors by organizing the Bank and transferring such assets to the Bank; that on December 12, 1950, the Sobols organized the Bank under the laws of Colorado, and on or about December 15, 1950, caused the Finance Company to advance $360, which was deposited to the credit of the Bank in the American National Bank of Denver; that on December 26, 1950, each of the Sobols executed and delivered to the American National Bank a promissory note in the principal sum of $39,880 to evidence a loan in the aggregate amount of $119,640; that the loan was negotiated upon the representation by the Sobols that they desired to organize the Bank and that they were required to file an affidavit with the State Banking Commissioner that the capital of such bank was fully paid in cash; that the Sobols agreed with the American National Bank, at the time the loan was negotiated, that they would liquidate such loan within one week; that the proceeds of the loan were deposited to the credit of the Bank on December 26, 1950; that after the organization of the Bank, Harry Sobol became its president, M. B. Sobol its vice-president, and Chester Sobol its secretary and treasurer, and that such officers constituted the entire board of directors of the Bank; that on January 2, 1951, the Sobols, acting for the Bank, and Harry Sobol, acting for the Finance Company, made a pretended agreement whereby the Finance Company agreed to transfer and assign to the Bank the secured notes above referred to for $120,000 in cash, a time deposit certificate to be issued by the Bank to the Finance Company for $72,828.35, and the assumption of indebtedness in the amount of $77,548.77, then owing by the Finance Company to the American National Bank; that the $120,000 was the proceeds of the $119,640 loan made by the American National Bank to the Sobols and the $360 in cash deposited in the American National Bank to the credit of the Bank; that such pretended sale and transfer was completed on January 2, 1951; that at that time the Bank occupied premises theretofore occupied by the Finance Company; that the capital of the Bank consisted of 1,000 shares of stock of the par value of $100 each; that $333\frac{1}{3}$ shares of such stock were issued to each of the Sobols; that pursuant to such plan, and on January 2, 1951, the Bank issued its check to the Finance Company for $120,000, drawn against the proceeds of the three loans made by the American National Bank to the Sobols, and that the Finance Company then executed three checks to the Sobols, each for $39,918.77; that the Sobols endorsed and delivered such checks to the American National Bank in payment of their three notes to the American National Bank; that thereafter the Sobols continued in possession of the Bank and in effect continued the business of the Finance Company under the corporate name of the Bank; that the notes transferred, aggregating $270,377.12, constituted all the assets of the Finance Company, with the exception of a note for $18,000 secured by a real estate mortgage executed and delivered to Harry Sobol by Orville G. and Helen J. Lawless, on January 2, 1951; that the transfer of such secured notes from the Finance Company to the Bank was made for the purpose of hindering, delaying, and defrauding the creditors of the bankrupt; and that Harry Sobol did not list such secured notes in the bankruptcy schedules as assets of the Finance Company.[3]

3. The complaint contained three other causes of action not here material.

The trustee prayed for a judgment ordering and commanding the defendants to deliver to the trustee all the property, money, and assets held by the Bank to be administered as part of the bankrupt estate, and commanding the defendants, Chester Sobol and M. B. Sobol, to deliver to the trustee all the capital stock of the Bank held by them, or, in the alternative, to impress the property, assets, and money of the Bank with a trust for the benefit of the trustee to the extent of $270,377.12, with interest from January 2, 1951.

Schokett and Newman filed a petition for leave to intervene and filed an answer and cross-complaint. In the cross-complaint, Schockett and Newman alleged that prior to February 7, 1951, they made various loans to Harry Sobol; that on that date they aggregated $55,000; that such loans were evidenced by promissory notes signed by the Finance Company; that prior to making such loans, on April 7, 1950, Harry Sobol, Sarah L. Sobol, Howard J. Sobol, and Maurice B. Sobol executed and delivered to Schokett and Newman a writing guaranteeing the payment of such notes; that on February 7, 1951, at the request of Harry Sobol, Schockett and Newman cancelled such notes, aggregating $55,000, and such written guarantee, and as consideration therefor received from Harry Sobol his promissory note in the amount of $55,000 and an assignment from Harry Sobol of certificate No. 4 for 332⅓ shares of the capital stock of the Bank; that such note and stock certificate are now held by Schockett and Newman; that at the time of the cancellation of the notes, aggregating $55,000, and the written guarantee, Schockett and Newman had no notice or knowledge of the alleged fraudulent acts of the defendants averred in the complaint of the trustee; that Schockett and Newman accepted such note and assignment of stock in good faith, and that there is due on such note the principal of $55,000, with interest from July 1, 1951, at the rate of six per cent per annum. The intervenors prayed for judgment on their cross-complaint awarding them a first and prior lien on 332⅓ shares of the capital stock of the Bank, or the proportionate distributive value of such stock of such Bank, should it be ordered to be dissolved by the court.

Schockett and Newman also set up a second claim in their cross-complaint in which they alleged that on February 7, 1951, Schockett purchased from M. B. Sobol ten shares of the stock of the Bank and paid therefor $1,200; that the Bank issued to Schockett stock certificate No. 11 for ten shares of the stock of the Bank; that Schockett is the owner and holder of such stock certificate; that Schockett neither before nor at the time of purchasing such ten shares of stock had any notice or knowledge of the alleged fraudulent acts of the defendants averred in the trustee's complaint, and that he purchased such stock in good faith for a valuable consideration. On the second claim, Schockett prayed for a judgment adjudging that he is the owner of such ten shares of stock, or the proportionate distributive value of such shares of stock, should the Bank be ordered dissolved by the court.

The complaint of the trustee sought a judgment commanding the Bank to deliver to the trustee all the assets of the Bank, or impress a trust on all the assets of the Bank to the extent of $270,377.12, with interest from January 2, 1951. The trustee sought no relief with respect to the 332⅓ shares of stock of the Bank held by Schockett and Newman as collateral security, or the ten shares of stock held by Schockett.

We know of no principle of law which gives to the purchaser of corporate stock the status or rights of a bona fide purchaser for value as against creditors of the corporation. No facts are alleged by Schockett and Newman which would create an estoppel in their behalf against the creditors of the bankrupt and bar recovery, for the benefit of the creditors of the bankrupt, of the assets of Harry Sobol and the Finance Company alleged to have been fraudulently transferred to the Bank. Of course, if the assets are recovered by the trustee, the stockholders of the Bank will be hurt, but certainly a stockholder in a corporation has no rights until the creditors of the corporation or claims of third per-

260

sons against the assets of the corporation are satisfied.

Schockett and Newman do not allege that the Bank is not properly defending the action brought by the trustee. Neither do they assert a derivative right as stockholders to defend such action.

 Schockett and Newman have no rights other than as stockholders in the Bank. The trustee, by his action, does not seek to assert any claim against them as stockholders or against the stock held by them as collateral security or the ten shares held by Schockett. It is clear, therefore, that the judgment sought by the trustee will not prejudice any rights that Schockett and Newman have as stockholders of the Bank and their right to intervention, if any, is permissive only.

In the absence of an abuse of discretion, no appeal lies from an order denying leave to intervene where intervention is permissive only and rests in the discretion of the court.[4]

Accordingly, we conclude that the trial court did not abuse its discretion in denying leave to intervene and the appeal is dismissed.

---

4. Rowan v. Harburney Oil Co., 10 Cir., 91 F.2d 122, 124; Demulso Corporation v. Tretolite Co., 10 Cir., 74 F.2d 805, 807; Brotherhood of Railroad Trainmen v.

Baltimore & Ohio R. Co., 331 U.S. 519, 524, 67 S.Ct. 1387, 91 L.Ed. 1646.

